**The relief described hereinbelow is SO ORDERED.**

**SIGNED this 24th day of September, 2013.**



_____
Robert D. Berger
United States Bankruptcy Judge

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF KANSAS

In re:

**GMJ GLOBAL LOGISTICS, INC., et al.,**            Case No. 12-20078
        **Debtor,**

**CHRISTOPHER J. REDMOND,**
**CHAPTER 11 TRUSTEE OF DEBTOR**
**SPORTS ASSOCIATED TRANSPORTATION, INC.,**
        **Plaintiff,**

       v.                                                           Adv. No. 12-06078

**IGT, INC.,**
        **Defendant.**

**MEMORANDUM OPINION AND ORDER GRANTING**
**DEFENDANT IGT'S MOTION FOR SUMMARY JUDGMENT**

     This matter comes before the Court on Defendant IGT's Motion for Summary Judgment.[1]

After reviewing the pleadings and considering the oral arguments heard on August 7, 2013, the

---

[1] Doc. 7.

13.09.24 Redmond v IGT SJ Order.wpd

Court is prepared to rule.

## Introduction

The Trustee sued Defendant to recover $87,339.49 that IGT owes Sports Associated Transportation (Debtor).[2] IGT responded with its counterclaim against Debtor for $408,788.32 and requested that this Court set-off the debts pursuant to 11 U.S.C. § 553. IGT also asserted the doctrine of recoupment. IGT timely filed the Motion for Summary Judgment presently before this Court. For the reasons set forth below, the Motion is granted. Judgment shall be entered in favor of Defendant IGT.

## Findings of Fact

Defendant IGT manufactures and distributes gambling devices and related products. IGT's manufacturing facility is located in Reno, Nevada. IGT's business model requires the shipment of its products from its manufacturing facility to its customers and, in certain cases, those products are returned to IGT. To accomplish this task, IGT entered into a Confidential Transportation Agreement (Agreement)[3] with Debtor in 2002. Pursuant to paragraph 2(b) of the Agreement, Debtor agreed to "promptly and efficiently receive, transport and deliver safely and with reasonable dispatch and without delay, the goods entrusted to it hereunder . . . ." In addition to agreeing to transport IGT's goods, Debtor also agreed "not to interline or use other motor carriers, or brokers, or to use 'substituted services' by rail for SHIPPER'S [IGT's] goods without prior written agreement of SHIPPER."[4] Throughout the Agreement, Debtor was referred to as "CARRIER." Under the Agreement, Debtor is the carrier and not a broker.

---

[2] Sports Associated Transportation is one of 11 debtors in this administratively consolidated case.
[3] Doc. 7, Ex. A ¶ 2(b) at 2.
[4] Doc. 7, Ex. A ¶ 2(e) at 2.

- 2 -

13.09.24 Redmond v IGT SJ Order.wpd

Despite this explicit agreement, Debtor in fact acted as a broker. Throughout the course of the contract, Debtor contracted with various carriers to transport IGT's products.[5] The carriers would then send their invoices to Debtor, who would add a broker's fee and forward the invoices to IGT.

A third key provision of the Agreement covered indemnification. The provision states:

> CARRIER shall at all times indemnify, defend and hold harmless SHIPPER, its agents and employees against and from any and all settlements, losses, damages, costs, counsel fees and all other expenses relating to or arising from any and all claims of every nature or character (including, but without limitations, claims for bodily injury, death and damage to property, clean-up costs from commodity spills and damage to the environment) asserted against SHIPPER (a) by any agent or employee of CARRIER or (b) by any other person. The provisions of this paragraph shall survive cancellation, termination, or expiration of this Agreement.[6]

By virtue of this provision, IGT seeks indemnification from Debtor.

Although Debtor operated as a broker instead of a carrier, the parties otherwise performed in accordance with the contract from 2002 until sometime in 2011. According to IGT, in the fall of 2011 various motor carriers (Carriers) contacted IGT seeking payment for freight charges that Debtor had failed to pay. Debtor had failed to pay these Carriers even though IGT had already paid Debtor. Once IGT learned that Debtor was not paying the Carriers, IGT stopped paying Debtor. Even though Debtor had stopped paying most of the carriers at this time, it still paid a few of them.[7] The Trustee initiated this adversary proceeding to recover the

---

[5] Debtor asserts that in some cases it did act as a carrier pursuant to the contract. Regardless, the shipments for which Debtor may have been the carrier are not at issue here.

[6] Doc. 7, Ex. A ¶ 5 at 4.

[7] It is not clear whether Debtor paid these Carriers; however, because IGT does not contest for purposes of this motion that Debtor did pay the Carriers, the Court will treat the claim as if Debtor is owed $87,339.49. If Debtor did not pay the Carriers, which seems likely based on the evidence, Debtor would only be entitled to the broker's fee and not the entire amount of the invoice. By not contesting the amount of the debt, IGT is giving up a potentially legitimate claim against the estate.

$87,339.49 from the outstanding invoices that IGT did not pay.

As to the shipments for which Debtor did not pay the Carriers, those Carriers turned to IGT for payment. The Carriers' claims against IGT totaled $693,743.92. IGT paid $408,788.32 to settle them. Because IGT had to pay the cost of these shipments twice, once to Debtor and once to the Carriers directly, IGT has a claim against the estate for $408,788.32 for breach of contract and for indemnification. IGT concedes that it owes the Debtor $87,339.49 and asks this Court to set off that amount against IGT's claim.

Debtor does not dispute that it did not pay the above carrier charges even though IGT provided Debtor the funds to pay them. Instead, Debtor alleges that IGT had no obligation to pay the Carriers directly and therefore Debtor is not required to indemnify IGT.

## Conclusions of Law

**A.    Summary Judgment Standard**

Summary judgment is appropriate if the movant shows that there is no genuine dispute as to any material fact and that the movant is entitled to judgment as a matter of law.[8] The moving party bears the initial burden of demonstrating, by reference to pleadings, depositions, answers to interrogatories, admissions, and affidavits, the absence of genuine issues of material fact.[9] In making this determination, the Court draws all reasonable inferences in favor of the non-moving party.[10] Once a properly supported summary judgment motion is filed, the opposing party "must respond with specific facts showing the existence of a genuine factual issue to be tried" and

---

[8] Fed. R. Bankr. P. 7056; Fed. R. Civ. P. 56.
[9] *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).
[10] *See Taylor v. Roswell Independent School Dist.*, 713 F.3d 25, 34 (10th Cir. 2013) (quoting *Witt v. Roadway Exp.*, 136 F.3d 1424, 1429 (10th Cir. 1998) (citation omitted)).

"may not rest on the allegations contained in his complaint."[11]

Defendant IGT moved for summary judgment. For the reasons set forth below, IGT has satisfied its burden as required by Fed. R. Civ. P. 56 and Fed. R. Bankr. P. 7056.

**B.    Debtor's Claims Against IGT**

Debtor asserts that IGT owes it $87,339.49 pursuant to the Agreement. This claim arises from IGT's refusal to pay the invoices sent by Debtor to IGT. IGT does not contest for purposes of this motion that Debtor paid the invoiced charges directly to the Carriers. Because the Agreement required IGT to pay the Debtor, the Court finds that IGT owes Debtor $87,339.49.

**C.    IGT's Claims Against Debtor**

IGT asserts that it has a claim against the estate for $408,788.32. The issue is whether IGT was required to settle the claims with the Carriers or whether only the Debtor was liable to the Carriers and therefore the claim should be disallowed. Both parties agree that the majority view, as outlined in *Oak Harbor Freight Lines, Inc. v. Sears Roebuck & Co.*,[12] generally places liability on the shipper in cases such as this one. However, Debtor argues that the facts here present an exception to the general rule, and therefore IGT has a legal defense that precludes IGT from being liable to the Carriers. Debtor claims that because IGT signed the non-recourse provision on at least some of the bills of lading, IGT is not entitled to claim the entire $408,788.32 against the estate. The Court finds that *Illinios Steel Co. v. Baltimore & O. R. Co.*[13] precludes this defense and that IGT was liable to the Carriers. Summary judgment in favor of

---

[11] *Otteson v. U.S.*, 622 F.2d 516, 519 (10th Cir. 1980) (citing *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157-59 (1970)).
[12] 513 F.3d 949 (9th Cir. 2008).
[13] 320 U.S. 508 (1944).

IGT is appropriate on this issue.

### 1. Shipping Contracts

Shipping contracts often involve two agreements that operate in tandem. These are the shipping agreement and the bill of lading. The shipping agreement governs the rights and obligations between a shipper and a carrier over the course of multiple transactions. The bill of lading, on the other hand, only controls the shipment of the goods described on its face. The bill of lading "is the basic transportation contract between the shipper-consignor and the carrier; its terms and conditions bind the shipper and all connecting carriers."[14] Although it is often the case that the shipper and carrier are the parties to both the shipping agreement and the bill of lading, when there is a third party broker involved, the coordination of these agreements is less clear. In this case, the dispute is between IGT and the Carriers, so the shipping agreement has only a minor role, which the Court will discuss in section C.3, *infra*.

### 2. The Bill of Lading

The Trustee's argument arises from two conflicting provisions within the bills of lading signed by IGT and the Carriers. These are the "prepaid" and "nonrecourse"[15] provisions. A bill of lading marked "prepaid" signifies that the charges for transportation service rendered at the request of a consignor (shipper) will be paid by the consignor. All of the shipments from IGT to its customers were prepaid shipments. The alternative provision is a collect shipment. In a

---

[14] *Oak Harbor*, 513 F.3d at 953 (quoting *S. Pac. Transp. Co. v. Commercial Metals Co.*, 456 U.S. 336, 342 (1982)).

[15] The "Straight Bill of Lading" signed by IGT (Doc. 10, Ex. 2) provides, "Subject to section 7 of the conditions, if this shipment is to be delivered to the consignee without recourse on the consignor, the consignor shall sign the following statement: The carrier shall not make delivery of this shipment without payment and other lawful charges." IGT presented an alternative bill of lading with more favorable language for IGT. However, since IGT is unable to show that its bill of lading was actually used in any of the shipments, the Court will only look to the language from the bill of lading provided by Debtor. IGT would prevail regardless of which language was used.

- 6 -

13.09.24 Redmond v IGT SJ Order.wpd

collect shipment, the consignee (the person receiving the shipment) is primarily liable for payment at the time of delivery. The default conditions of a standard bill of lading are summarized as follows:

> The bill of lading provides that the owner or consignee shall pay the freight and all other lawful charges upon the transported property and that the consignor remains liable to the carrier for all lawful charges. The bill of lading, however, also contains "nonrecourse" and "prepaid" provisions that, if marked by the parties, release the consignor and consignee from liability for the freight charges. If the nonrecourse clause is signed by the consignor and no provision is made for the payment of freight, delivery of the shipment to the consignee relieves the consignor of liability. Similarly, when the prepaid provision on the bill of lading has been marked and the consignee has already paid its bill to the consignor, the consignee is not liable to the carrier for payment of the freight charges.[16]

Here, the shipment charges that IGT settled with the Carriers were for prepaid shipments. On some of these shipments, the nonrecourse provision was also signed by IGT. According to the Trustee, by signing the nonrecourse provision, IGT insulated itself from liability once the Carriers delivered the shipments. The issue is what happens when both the prepaid and nonrecourse provisions are checked on the same bill of lading. IGT argues that the nonrecourse provision only applies to collect shipments and that it would be "logically irrelevant" to uphold a signed nonrecourse provision in a prepaid shipment. However, both the *Illinois Steel* case and the fact that IGT signed the nonrecourse provision on prepaid bills of lading indicate that the two provisions should be read together.

In *Illinois Steel*, the Supreme Court considered the relationship between the prepaid and nonrecourse provisions on a bill of lading. In that case, the shipper prepaid the freight charges, but also signed the section 7 nonrecourse box. The carrier argued, just as IGT does here, that

---

[16] *C.A.R. Transp. Brokerage Co., Inc. v. Darden Restaurants, Inc.*, 213 F.3d 474, 478-79 (9th Cir. 2000) (citations omitted).

- 7 -

13.09.24 Redmond v IGT SJ Order.wpd

"liability was imposed [by the lower court] on the consignor only because the prepayment clause was so in conflict with the non-recourse clause as to nullify the latter and thus revive the obligation which, in the absence of that clause, rests on the consignor to pay all lawful charges" on the shipments.[17]

The Supreme Court disagreed and said, "[W]e must assume that both clauses were intended by the parties to have some effect, and hence, unless unavoidably in conflict, they must, so far as they reasonably may, be reconciled so that each will have some scope for operation."[18] To reconcile the two clauses, the Court held that the non-recourse provision only applied to the charges beyond those already agreed upon by the parties.

> The words of [section] 7 of the conditions of the bill of lading are to the effect that if the consignor stipulates that the carrier shall not deliver "without requiring payment of such charges" and the carrier makes delivery, the consignor "shall not be liable for such charges." In this context, "such charges" are the lawful charges which the consignor has not paid or stipulated to pay in advance.[19]

Here, there are no additional charges; instead, the dispute is over the shipper's liability for the charges that it had agreed to pay. If the cost of the shipments had exceeded the agreed upon amount, then the nonrecourse provision would apply and prevent the Carriers from seeking payment from IGT of additional charges. Since there were no such additional charges, the prepaid clause required IGT to pay the agreed amount.[20]

---

[17] *Illinois Steel*, 320 U.S. at 513.
[18] *Id.* at 513-14.
[19] *Id.* at 514.
[20] *See also Jones Motor Co., Inc. v. Teledyne, Inc.*, 732 F. Supp. 490, 492 (D. Del. 1990) ("In other words, the prepayment clause renders the shipper liable for the original transportation charges. The non-recourse clause operates to shield the shipper from liability for the additional charges but not for the original charges it agreed to prepay."). *But see Gaines Motor Lines, Inc. v. Klaussner Furniture Indus., Inc.*, 2011 WL 1230811, at *1 (M.D.N.C. 2011) (granting summary judgment in favor of shipper because non-recourse clause meant the carriers could only turn to the broker for payment).

### 3. The Shipping Agreement

The second issue is whether the Debtor's role as broker renders the *Illinois Steel* analysis inapplicable to IGT. In *Illinois Steel*, the prepayment of the shipment occurred before the carrier delivered the shipment. Here, not only was the "prepayment" made by guarantee, but IGT as the consigner did not have a separate contract with the Carriers. Instead, the "shipping agreement" was between the Debtor and the Carriers. Although the law in this area is not settled, this Court finds that the correct analysis requires the shipper to remain liable.

To support their respective positions, the parties both cite *Oak Harbor Freight Lines, Inc. v. Sears Roebuck & Co.*[21] In *Oak Harbor*, the Ninth Circuit considered whether the shipper, Sears, was liable to the carrier even though it did not have an express agreement with the carrier outside the prepaid bill of lading. As in the case *sub judice*, Sears entered into a contract with a broker. The broker then contracted with carriers to ship Sears' products. Sears argued that when a bill of lading is marked prepaid, but no payment is actually made at the time of the shipment and the broker fails to pay, the carrier may pursue only the broker for breach of the shipping agreement.[22] In other words, by using a broker, Sears argued that it was insulated from liability to the carrier. This argument did not prevail.

In *Oak Harbor*, the Ninth Circuit Court held that "a shipper should bear the risk when it chooses to pay for freight charges through a broker rather than directly to the carrier."[23] The

---

[21] 513 F.3d 949 (9th Cir. 2008).

[22] *Id.* at 953. Sears paid the broker for freight charges within approximately five days after receipt of a bill from the broker.

[23] *Id.* at 959 (citing *Hawkspere Shipping Co. Ltd. v. Intamex, S.A.*, 330 F.3d 225, 237-38 (4th Cir. 2003); *Strachan Shipping Co. v. Dresser Indus., Inc.*, 701 F.2d 483, 489-90 (5th Cir. 1983); *Nat'l Shipping Co. of Saudi Arabia v. Omni Lines, Inc.*, 106 F.3d 1544, 1546-47 (11th Cir. 1997)).

court reasoned, and this Court agrees, that this result best "comports with economic reality."[24] The court noted:

> A freight forwarder provides a service. He sells his expertise and experience in booking and preparing cargo for shipment. He depends upon the fees paid by both shipper and carrier. He has few assets, and he books amounts of cargo far exceeding his net worth. Carriers must expect payment will come from the shipper, although it may pass through the forwarder's hands.[25]

Additionally, the *Oak Harbor* court noted that "the shipper, and not the carrier, is in the best position to avoid liability for double payment by dealing with a reputable freight forwarder, by contracting with the carrier to eliminate the shipper's liability, or by simply paying the carrier directly."[26] This Court finds these arguments persuasive. Just because IGT checked the "prepaid" box on the bills of lading, IGT cannot escape liability simply by contracting with a broker.

Debtor argues that the nonrecourse provision in the bill of lading provides an exception to the general rules of liability outlined in *Illinois Steel* and *Oak Harbor*. In *Oak Harbor*, the court implied that the result would have been different had Sears signed the Section 7 box on the bills of lading.[27] However, this is only *dicta*. This Court will not speculate as to what the *Oak Harbor* court might have found had the facts been different, especially in light of this Court's interpretation of the *Illinois Steel* decision.

Because the statements in *Oak Harbor* are *dicta*, this Court does not find an exception to

---

[24] 513 F.3d at 959 (quoting *Strachan Shipping Co. v. Dresser Indus., Inc.*, 701 F.2d 483, 490 (5th Cir. 1983)).
[25] *Id.*
[26] *Id.*
[27] *Id.* at 960 (stating that "Sears generated the bills of lading and failed to protect itself with a 'nonrecourse' designation.").

the rule that the shipper remains liable, even though it contracted through a broker and signed the nonrecourse clause. Moreover, the Agreement between IGT and Debtor listed Debtor as the carrier. Debtor breached the Agreement by acting as a broker. Debtor is estopped from now claiming that IGT's claim should fail because it contracted through a broker. IGT was correct when it paid the Carriers.

### D.     Set-Off

IGT argues that the claim by Debtor should be set off against the larger claim by IGT. The Court agrees. Section 553 of the Bankruptcy Code provides:

> Except as otherwise provided in this section and in sections 362 and 363 of this title, this title does not affect any right of a creditor to offset a mutual debt owing by such creditor to the debtor that arose before the commencement of the case under this title against a claim of such creditor against the debtor that arose before the commencement of the case . . . .

Based on the Court's findings, the claims by Debtor against IGT and the claims by IGT against Debtor arose before the commencement of the case and were mutual debts preserved and subject to setoff under § 553. Therefore, IGT is entitled to set off the claims by Debtor against IGT's claims. IGT's allowed claim against the estate is the difference between $408,788.32 and $87,339.49, or $321,448.83. Post-setoff, IGT has no liability to the estate. Since the issue of setoff is resolved in IGT's favor, the Court does not address IGT's other argument under the doctrine of recoupment.

### E.     Conclusion

For the reasons stated above, the Defendant's Motion for Summary Judgment is GRANTED. A separate order of judgment shall be entered in favor of Defendant.

### ###

- 11 -

13.09.24 Redmond v IGT SJ Order.wpd

Case 12-06078    Doc# 20    Filed 09/24/13    Page 11 of 12

ROBERT D. BERGER
U.S. BANKRUPTCY JUDGE
DISTRICT OF KANSAS